*MA*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ETTA SCOTT, on behalf of herself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 12 C 9289 |
| v. | ) ) | Judge Ruben Castillo |
| WESTLAKE SERVICES, LLC d/b/a WESTLAKE FINANCIAL SERVICES, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Etta Scott brings this putative class action against Westlake Services, LLC ("Westlake"),

doing business as Westlake Financial Services, alleging violations of the Telephone Consumer

Protection Act (the "TCPA" or the "Act"), 47 U.S.C. § 227 *et seq.* Westlake asserts that it made

a full offer of relief to Scott on both of her claims prior to Scott moving for class certification

and, consequently, her claims are moot. Therefore, presently before the Court is Westlake's

motion to dismiss Scott's claims for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1)

of the Federal Rules of Civil Procedure. For the reasons set forth herein, the Court finds that

Scott's claims are indeed moot and that it accordingly lacks subject-matter jurisdiction over

them. Hence, the Court grants Westlake's motion to dismiss.

### RELEVANT FACTS

Westlake is a California business entity headquartered in Los Angeles. (R. 6, Am.

Compl. ¶ 6.) Scott is a resident of Chicago, Illinois and has never had a business relationship

with Westlake nor given Westlake permission to contact her on her cellular telephone. (*Id.* ¶¶ 4-

1

5.) Beginning in or around October 2012, Westlake placed automated calls to Scott's cellular telephone using an automatic telephone dialing system ("ATDS"). (*Id.* ¶ 10) (R. 19-1, Def.'s Mem., Ex. A, Settlement E-mail). Scott alleges that Westlake placed a total of 20 such calls: with seven calls made on or about November 10, 2012; nine calls made on or about November 12, 2012; and four calls made on or about November 16, 2012. (R. 6, Am. Compl. ¶¶ 12-14, 16.) Therefore, Scott alleges that Westlake violated Section 227(b)(1)(A) of the TCPA by negligently, knowingly, or willfully placing these automated calls to her cellular telephone without her prior express consent as required by the Act.[1] (*Id.* ¶¶ 1, 19.)

## PROCEDURAL HISTORY

On November 20, 2012, Scott commenced this suit by filing a complaint with this Court in her individual capacity and on behalf of others similarly situated against Westlake Financial Network, Inc. for violations of the TCPA. (R. 1, Compl.) On January 17, 2013, Scott filed a first amended complaint, again in her individual capacity as well as on behalf of others similarly situated, against Westlake Services, LLC, doing business as Westlake Financial Services—the Defendant to this suit. (R. 6, Am. Compl.) Therefore, on January 17, 2013, Westlake Financial Network, Inc. was terminated as a Defendant to this suit. (*Id.*)

In Count I of the amended complaint, Scott alleges that Westlake violated Section 227(b)(1)(A) of the TCPA by *negligently* placing multiple automated telephone calls to her and other putative class members' cellular telephones without their prior express consent. (*Id.* ¶¶ 33-

---

[1] 47 U.S.C. § 227(b)(1)(A) makes it "unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States to make any call (other than a call made for emergency purposes *or made with the prior express consent of the called party*) using any automatic telephone dialing system or an artificial or prerecorded voice to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis supplied).

35.) In Count II of the amended complaint, Scott alleges that Westlake *knowingly* or *willfully* violated the TCPA by placing multiple automated telephone calls to her and other putative class members' cellular telephones without their prior express consent. (*Id.* ¶¶ 38-40.)

Scott prays for injunctive relief, pursuant to Section 227(b)(3)(A) of the TCPA, prohibiting Westlake from further violating the Act.[2] (*Id.* ¶ 7.) She also seeks statutory damages of $500, pursuant to Section 227(b)(3)(B) of the TCPA, for each and every automated call Westlake made in violation of the Act,[3] and treble damages of up to $1,500, pursuant to Section 227(b)(3)(C) of the TCPA, for each and every automated call Westlake knowingly or willfully made in violation of the Act.[4] (*Id.*) In addition, Scott seeks an award of attorneys' fees and costs. (*Id.*)

On February 5, 2013, after Scott commenced this cause of action, Westlake e-mailed her a settlement offer, which provided that Westlake would pay Scott "the sum of $1,500 for each and every dialer-generated telephone call made to" her. (R. 19-1, Def.'s Mem., Ex. A, Settlement E-mail.) Westlake also offered to pay Scott "all costs which she would recover if she were to prevail in the lawsuit, including the cost of any filing fee and any service fees which would be taxable as costs." (*Id.*) In addition, Westlake agreed to an injunction prohibiting itself from making any future calls to Scott without her prior express consent. (*Id.*)

---

[2] 47 U.S.C. § 227(b)(3)(A) provides: "A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State . . . an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation[.]"

[3] 47 U.S.C. § 227(b)(3)(B) provides: "A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State . . . an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater[.]"

[4] 47 U.S.C. § 227(b)(3)(C) provides: "If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph," (i.e., $1,500).

Westlake further stated that its records reflected a total of six dialer-generated calls made to Scott's cellular telephone during the alleged time period, but it offered to discuss the exact number of calls with Scott and her counsel in order to resolve any discrepancies over the number of dialer-generated calls actually made. (*Id.*) ("[Westlake's] records, however, reflect that all of the calls made on [November 10, 12, and 16, 2012] were manually dialed and, further, that there were a total of only six dialer generated calls. If you would care to share with me the basis for your belief that the November 10, 12, and 16 calls were dialer generated, perhaps *we can resolve this discrepancy*.") (emphasis supplied). On February 6, 2013, Scott rejected Westlake's offer and moved this Court to certify a class. (R. 14, Pl.'s Mot. Class Certification; R. 19-2, Def.'s Mem., Ex. B, Rejection E-mail.)

On February 13, 2013, Westlake moved to dismiss this case pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that Scott's claims are moot, thereby divesting this Court of subject-matter jurisdiction over them. (R. 18, Def.'s Mot.; R. 19, Def.'s Mem. at 3.) Westlake asserts that its e-mail of February 5, 2013 was an offer of complete relief made before Scott moved this Court to certify a class of plaintiffs. (R. 19, Def.'s Mem. at 3.) Westlake therefore alleges that Scott does not retain any personal interest in her claims, rendering them moot and subject to mandatory dismissal. (*Id.*) Westlake argues that Scott cannot avoid a finding of mootness by moving for class certification *after* receiving an offer of full relief, nor can she do so by alleging that there is a dispute over the number of automated calls made. (*Id.* at 4.) Westlake argues that its settlement offer was "unconditional," as it offered to pay Scott $1,500, the maximum statutory penalty, "for each and every dialer-generated call," and that limited discovery would confirm the exact number of calls. (*Id.*) (R. 19-1, Def.'s Mem., Ex. A, Settlement E-mail).

4

On February 20, 2013, Scott responded to Westlake's motion to dismiss. (R. 23, Pl.'s Resp.) Scott argues that Westlake only offered relief for six of the 20 automated calls alleged in her complaint, and thus a "live" case remains between herself and Westlake due to the controversy regarding the number of automated calls, Westlake's offer was not one of full relief sufficient to moot her claims. (*Id.* at 4-5.) Therefore, Scott argues that this Court retains subject-matter jurisdiction to adjudicate this "live" controversy. (*Id.* at 4.)

On March 7, 2013, Westlake replied to Scott's response, arguing that Scott cannot characterize its offer of relief as confined to only six automated calls. (R. 25, Def.'s Reply at 2.) Westlake maintains that its offer for "each and every" call is not "an indefinite term" such that Scott can avoid the mooting of her claims. (*Id.*) (quoting *Damasco v. Clearwire Corp.*, No. 10-cv-3063, 2010 WL 3522950, at *3 (N.D. Ill. Sept. 2, 2010) (Zagel, J.), *aff'd*, 662 F.3d 891 (7th Cir. 2011)). Westlake argues that this case is governed by the Seventh Circuit's decision in *Damasco v. Clearwire Corp.*, 662 F.3d 891 (7th Cir. 2011), which Westlake asserts is "clear and binding" and "controlling in this case." (R. 25, Def.'s Reply at 1, 3.)

This Court has federal-question jurisdiction to determine whether it has subject-matter jurisdiction over this private cause of action arising under the TCPA pursuant to 28 U.S.C. § 1331. (R. 6, Am. Compl. ¶ 2) (citing 28 U.S.C. § 1331). The Supreme Court in *Mims v. Arrow Fin. Servs., LLC*, ——U.S.——,——, 132 S. Ct. 740, 745, 753 (2012), resolving a split

among the Circuits as to whether Congress granted State courts exclusive jurisdiction over

private causes of action brought pursuant to the TCPA,[5] held

> that federal and state courts have concurrent jurisdiction over private suits arising under the TCPA . . . [and] that Congress did not deprive federal courts of federal-question jurisdiction over private TCPA suits. . . . Nothing in the text, structure, purpose, or legislative history of the TCPA calls for displacement of the federal-question jurisdiction U.S. district courts ordinarily have under 28 U.S.C. § 1331. In the absence of direction from Congress . . . we apply the familiar default rule: Federal courts have § 1331 jurisdiction over claims that arise under federal law.

(*Id.*) (citing *Mims*, 132 S. Ct. at 751-53).

## LEGAL STANDARD

A motion brought pursuant to Federal Rule of Civil Procedure 12(b)(1) raises the

fundamental question of whether a federal district court has subject-matter jurisdiction over the

action before it; thus, a motion pursuant to Rule 12(b)(1) asks a court to dismiss an action over

which it allegedly lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1); *see, e.g., Steel Co.*

*v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). Subject-matter jurisdiction under

Article III of the Constitution "goes to the fundamental institutional competence of the court."

*McBee v. Delica Co., Ltd.*, 417 F.3d 107, 127 (1st Cir. 2005). It is "fundamental that if a court is

without jurisdiction of the subject matter it is without power to adjudicate and the case [must] be

properly disposed of only by dismissal of the complaint for lack of jurisdiction." *Stewart v.*

---

[5]  *Compare Murphey v. Lanier*, 204 F.3d 911, 915 (9th Cir. 2000) (holding that United States district courts lack federal-question jurisdiction over private causes of action brought under the TCPA); *ErieNet, Inc. v. Velocity Net, Inc.*, 156 F.3d 513, 519 (3d Cir. 1998) (same); *Foxhall Realty Law Offices, Inc. v. Telecomms. Premium Servs., Ltd.*, 156 F.3d 432, 434 (2d Cir. 1998) (same); *Nicholson v. Hooters of Augusta, Inc.*, 136 F.3d 1287-88 (11th Cir. 1998) (same); *Chair King, Inc. v. Hous. Cellular Corp.*, 131 F.3d 507, 514 (5th Cir. 1997) (same); *Int'l Sci. & Tech. Inst. v. Inacom Comm'ns, Inc.*, 106 F.3d 1146, 1158 (4th Cir 1997) (same), *with Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 463-65 (6th Cir. 2010) (holding that United States district courts have federal-question jurisdiction over private causes of action brought under the TCPA); *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 447 (7th Cir. 2005) (same); and *ErieNet*, 156 F.3d at 521 (Alito, J., dissenting) (same).

*United States*, 199 F.2d 517, 519 (7th Cir. 1952). "The burden of proof on a 12(b)(1) issue is on the party asserting jurisdiction." *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (2012).

Dismissal pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction includes dismissal on the basis of the justiciability doctrine of mootness, as mootness is an issue concerning the subject-matter jurisdiction of the federal courts. *See, e.g., Cnty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979) ("But jurisdiction, properly acquired, may abate if the case becomes moot[.]"); *Cornucopia Inst. v. U.S. Dep't of Agric.*, 560 F.3d 673, 676 (7th Cir. 2009) ("It is well established that the federal courts have no authority to rule where the case or controversy has been rendered moot.") (citing *Church of Scientology of Cali. v. United States*, 506 U.S 9, 12 (1992)). It has long been clear that a court must inquire into its jurisdiction to guard against the consequences that befall when a court adjudicates a "Case" or "Controversy" over which it lacks (or lacked) jurisdiction. *Williams v. Nottawa*, 104 U.S. (14 Otto) 209, 211 (1881) ("In extending a long way the jurisdiction of the courts of the United States, Congress was specially careful to guard against the consequences of" a lack of jurisdiction.).

Motions to dismiss for lack of subject-matter jurisdiction fall into two general, but acutely distinct, categories: "facial and factual attack[s.]" *Hay v. Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 n.2 (7th Cir. 2002); *see also Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (Noting "the *critical difference* between facial and factual challenges to jurisdiction."). "Facial challenges require only that the court look to the complaint and see if the plaintiff has sufficiently *alleged* a basis of subject matter jurisdiction." *Apex Digital*, 572 F.3d at 443 (citing *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)).

When presented with a facial challenge "the court does not look beyond the allegations in the complaint, which are taken as true for purposes of the motion." *Id.* at 444 (citing *Lawrence*, 919 F.2d at 1529).

By contrast, a factual attack "lies where the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction." *Id.* (quoting *United Phosphorus, Ltd*, 322 F.3d at 946) (internal quotation marks omitted). As the Seventh Circuit noted in *Apex Digital*, 572 F.3d at 444, the difference between facial and factual attacks on subject-matter jurisdiction has been aptly described by the Third Circuit:

> The facial attack does offer similar safeguards to the plaintiff as Rule 12(b)(6) and Rule 56: the court must consider the allegations of the complaint as true. The factual attack, however, differs greatly for here the trial court may proceed as it never could under Rule 12(b)(6) or Rule 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*Mortensen v. First Fed. Sav. & Loan Assoc.*, 549 F.2d 884, 891 (3d Cir. 1977) (citing 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1350 (1969); *Gibbs v. Buck*, 307 U.S. 66, 71-72 (1939); *Wetmore v. Rymer*, 169 U.S. 115 (1898)) (footnote and internal alterations omitted). Thus, in evaluating a Rule 12(b)(1) motion to dismiss, "a court must first determine whether the movant presents a facial or factual attack." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) (citing *Mortensen*, 549 F.2d at 891).

If the defendant denies or controverts the truth of the jurisdictional allegations, "[i]n determining whether to dismiss for lack of jurisdiction, the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been

submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital*, 572 F.3d at 444 (quoting *Evers v. Astrue*, 536 F.3d 651, 656-57 (7th Cir. 2008)) (internal quotation marks omitted). The presumption of truth that is usually accorded to the allegations in a plaintiff's complaint "falls away on the jurisdictional issue once a defendant proffers evidence that calls the court's jurisdiction into question. At that point, a court need not close its eyes to demonstrated jurisdictional deficiencies in a plaintiff's case and accord a plaintiff's unproven allegations greater weight than substantive evidence to the contrary." *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 685 (7th Cir. 1998).

If a court's subject-matter jurisdiction is challenged as a factual matter either by the court or the opposing party, the party seeking to invoke the court's jurisdiction bears the burden of supporting its jurisdictional allegations by "competent proof." *See, e.g., Hertz Corp. v. Friend*, 559 U.S. 77, ——, 130 S. Ct. 1181, 1194-95 (2010) ("When challenged on allegations of jurisdictional facts, the parties must support their allegations by competent proof."); *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942) ("Accordingly, if a plaintiff's allegations of jurisdictional facts are challenged by the defendant, the plaintiff bears the burden of supporting the allegations by competent proof."); *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936) ("If [a party's] allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof."); *see also Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979) ("In cases where the jurisdiction of the court is challenged as a factual matter, the party invoking jurisdiction has the burden of supporting the allegations of jurisdictional facts by competent proof.") (citing *McNutt*, 298 U.S. at 189; *Land v. Dollar*, 330 U.S. 731, 735 (1947); *Thomson*, 315 U.S. at 446). The Supreme Court in *McNutt* also stated that "where [the allegations of jurisdictional facts] are not so challenged the court may still insist that

9

the jurisdictional facts be established or the case be dismissed, and for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence." 298 U.S. at 189.

"'Competent proof' . . . has been interpreted to mean a preponderance of the evidence or proof to a reasonable probability that jurisdiction exists." *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 237 (7th Cir. 1995) (quoting *Gould v. Artisoft, Inc.*, 1 F.3d 544, 547 (7th Cir. 1993)) (internal quotation marks omitted). Affidavits and other relevant evidence may be used to resolve any factual disputes regarding a court's jurisdiction. *Kontos v. U.S. Dep't of Labor*, 826 F.2d 573, 576 (7th Cir. 1987); *see also Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000) ("[T]he plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint.") (quoting *Prentice v. Prentice Colour, Inc.*, 779 F. Supp. 578, 583 (M.D. Fla. 1991)) (internal quotation marks omitted). In many cases in which a factual attack has been made on a court's subject-matter jurisdiction "the facts presented in support of and in opposition to . . . a motion [to dismiss for lack of subject-matter jurisdiction] may present a substantial factual controversy, the resolution of which requires the district court to weigh the conflicting evidence in arriving at the factual predicate upon which to base the legal conclusion that subject matter jurisdiction either exists or does not." *Grafton*, 602 F.2d at 783; *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[I]n some instances, if subject-matter jurisdiction turns on contested facts, the trial judge may be authorized to review the evidence and resolve the dispute on her own.") (citing 5B C. Wright & A. Miller, *Federal Practice and Procedure* § 1350, pp. 243-49 (3d ed. 2004)); *Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 745 (7th Cir. 2009) ("Indeed, the trial court is free to weigh the evidence and satisfy

10

itself as to the existence of its power to hear the case.") (quoting *Apex Digital*, 572 F.3d at 445) (internal quotation marks omitted).

## ANALYSIS

Article III, Section 2, of the United States Constitution limits the "judicial Power of the United States," that is, federal-court jurisdiction, to live "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1.[6]   The Supreme Court has stated

> [T]he judicial power of federal courts is constitutionally restricted to 'cases' and 'controversies.' As is so often the situation in constitutional adjudication, those two words have an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government. Embodied in the words 'cases' and 'controversies' are two complementary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine.

*Flast v. Cohen*, 392 U.S. 83, 94-095 (1968). By limiting the federal "judicial Power" to actual "Cases" and "Controversies," the Constitution restricts that "Power" to the traditional role of Anglo-American courts, which is to redress genuine grievances or to prevent actual or

---

[6]   Article III, Section 2, Clause 1 of the United States Constitution provides

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State,—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

U.S. Const., art. III, § 2, cl. 1.

imminently threatened injuries to persons caused by private or official violations of law. *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009); *see also Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) ("Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies. To invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.") (internal citations omitted).

The "judicial Power" of the lower federal courts is conferred upon them by Congress pursuant to its constitutional authority to "ordain and establish" the "inferior Courts" of the United States. U.S. Const., art. III, § 1 ("The judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."). "The Congressional power to ordain and establish inferior courts includes the power of investing them with jurisdiction." *Lockerty v. Phillips*, 319 U.S. 182, 187 (1943); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 173 (1803) (Marshall, C.J.) ("The constitution vests the whole judicial power of the United States in one supreme court, and such inferior courts as congress shall, from time to time, ordain and establish.").

It is important to reaffirm the axiom that the federal courts are possessed of limited jurisdiction and may only adjudicate those cases which fall within Article III, Section 2 of the Constitution and congressional authorizations enacted thereunder. U.S. Const., art. III, § 2;[7] *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting

---

[7] See Note 6, *supra*.

jurisdiction.") (internal citations omitted); *see also Kempe's Lessee v. Kennedy*, 9 U.S. (5

Cranch) 173, 185 (1809) (Marshall, C.J.) ("The courts of the United States are all of limited

jurisdiction, and their proceedings are erroneous, if the jurisdiction be not shown upon them.").

Mootness is a centuries-old doctrine that was largely based on prudential or discretionary

considerations until 1963, when the Supreme Court in *Liner v. Jafco* constitutionalized the

doctrine of mootness by fusing it with Article III of the Constitution's "Case" or "Controversy"

requirement. 375 U.S. 301, 306 n.3 (1964) ("Our lack of jurisdiction to review moot cases

derives from the requirement of Article III of the Constitution under which the exercise of

judicial power depends upon the existence of a case or controversy.") (citing Sidney A.

Diamond, *Federal Jurisdiction to Decide Moot Cases*, 94 U. Pa. L. Rev. 125 (1945-1946); Note,

*Cases Moot on Appeal: A Limit on the Judicial Power*, 103 U. Pa. L. Rev. 772 (1954-1955)).

Professor Matthew Hall, who has written extensively on the present subject and is considered to

be an authority in the field, has noted, "[i]n [its] earliest incarnation[ ], then . . . mootness . . .

[was] generally applied as though [it] were [a] discretionary, prudential doctrine[ ]. . . . Although

early justiciability cases were based largely on prudential considerations, the Supreme Court in

the mid-twentieth century transformed . . . mootness . . . into ostensibly [a] jurisdictional

doctrine[ ] mandated by the Constitution. . . . Subsequent cases . . . followed without question

*Liner's* rationale in holding that dismissal of moot claims was constitutionally mandated. The

constitutional basis of the mootness bar thus swiftly acquired the patina of settled doctrine."

Matthew I. Hall, *Asymmetrical Jurisdiction*, 58 UCLA L. Rev. 1257, 1302 n.57 (2011). Thus,

the jurisdictional ban against making any decisions in moot cases arises from this constitutional

requirement. *Liner*, 375 U.S. at 306 n.3; *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332,

341 (2006); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 703-04

(2000); *Lewis*, 494 U.S. at 477; *Honig v. Doe*, 484 U.S. 305, 317 (1988); *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 546 (1976); *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975); *O'Shea v. Littleton*, 414 U.S. 488, 493-94 (1974); *SEC v. Med. Comm'n for Human Rights*, 404 U.S. 403, 407 (1972) (quoting *Liner*, 375 U.S. at 306 n.3); *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (quoting *Liner*, 375 U.S. at 306 n.3).

Therefore, the doctrine of mootness arises out of the "Case" or "Controversy" requirement fixed in Article III of the Constitution. *Liner*, 375 U.S. at 306 n.3 ("Our lack of jurisdiction to review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy."); *see, e.g.*, *Massachusetts v. E.P.A.*, 549 U.S. 497, 536 (2007) ("Article III, § 2, of the Constitution limits the federal judicial power to the adjudication of 'Cases' and 'Controversies.' If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so.") (quoting *DaimlerChrysler Corp.*, 547 U.S. at 341) (internal quotation marks omitted); *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 598 (2007) ("Article III of the Constitution limits the judicial power of the United States to the resolution of 'Cases' and 'Controversies . . . No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies'") (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)) (internal quotation marks omitted); *Burke v. Barnes*, 479 U.S. 361, 363 (1987) ("Article III of the Constitution requires that there be a live case or controversy at the time that a federal court decides the case; it is not enough that there may have been a live case or controversy when the case was decided by the court whose judgment we are reviewing."); *Powell v. McCormack*, 395 U.S. 486, 496 n.7 (1969) ("The rule that this Court lacks jurisdiction

14

to consider the merits of a moot case is a branch of the constitutional command that the judicial

power extends only to cases or controversies.")

"The Supreme Court distinguished two aspects of the mootness doctrine: (1) whether the

issues presented are still 'live,' and (2) whether the parties have a legally cognizable interest in

the outcome ('personal stake')." *Davis v. Ball Mem'l Hosp. Ass'n, Inc.*, 753 F.2d 1410, 1416

(7th Cir. 1985) (citing *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 496 (1980)) (internal

quotation marks omitted). "We therefore are concerned here with the second aspect of

mootness, that is, the parties' interest in the litigation. The Court has referred to this concept as

the 'personal stake' requirement. The personal-stake requirement relates to the first purpose of

the case-or-controversy doctrine—limiting judicial power to disputes capable of judicial

resolution. The 'personal stake' aspect of mootness doctrine also serves primarily the purpose of

assuring that federal courts are presented with disputes they are capable of resolving." *Geraghty*,

445 U.S. at 403 (citing *Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 755 (1976); *Baker*,

369 U.S. at 204; *Flast*, 392 U.S. at 100-01).

The requirement that a plaintiff must demonstrate a personal stake in the outcome of the

litigation in order to avoid the mooting of his claims "limit[s] the federal judicial power to those

disputes which confine federal courts to a role consistent with a system of separated powers and

which are traditionally thought to be capable of resolution through the judicial process." *Valley*

*Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472

(1982) (quoting *Flast*, 392 U.S. at 97) (internal quotation marks omitted). As the leading legal

dictionary defines it, a "moot case" is "one in which a controversy no longer exists; a case that

presents only an abstract question that does not arise from existing facts or rights." Black's Law

Dictionary 1029 (Bryan A. Garner ed., 8th ed. 2004). "In other words, [the] mootness doctrine

encompasses the circumstances that destroy the justiciability of a suit previously suitable for determination." *Loughlin v. United States*, 393 F.3d 155, 169 (D.C. Cir. 2004) (internal quotation marks omitted).

In 1969, the Supreme Court established the basic test for mootness in *Powell*, 395 U.S. at 496 (citing E. Borchard, *Declaratory Judgments* at 35-37 (2d ed. 1941)), when it announced that "a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." This principle has been restated and adhered to myriad times by the Supreme Court (as well as by the lower federal courts), and it remains a cornerstone of mootness jurisprudence. *See, e.g., Chafin v. Chafin*, ——U.S.——,——, 133 S. Ct. 1017, 1023 (2013); *Already, LLC v. Nike, Inc.*, ——U.S.——,——, 133 S. Ct. 721, 726 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (*per curiam*)); *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 283 (2001) (quoting *Davis*, 440 U.S. at 631; citing *Powell*, 395 U.S. at 496); *Friends of the Earth*, 528 U.S. at 212 (Scalia, J., dissenting) (quoting *Powell*, 395 U.S. at 496); *City of Erie v. Pap's AM*, 529 U.S. 277, 287 (2000) (quoting *Davis*, 440 U.S. at 631; citing *Powell*, 395 U.S. at 496); *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 571 (1984) (citing *Powell*, 395 U.S. at 496-98); *Murphy*, 455 U.S. at 481 (quoting *Powell*, 395 U.S. at 496); *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 73 (1983) (Stevens, J., dissenting) (quoting *Powell*, 395 U.S. at 496); *Geraghty*, 445 U.S. at 396 (quoting *Powell*, 395 U.S. at 496); *Davis*, 440 U.S. at 631 (quoting *Powell*, 395 U.S. at 496); *accord St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 626 (7th Cir. 2007) (quoting *Powell*, 395 U.S. at 496); *Stotts v. Cmty. Unit Sch. Dist. No. 1*, 230 F.3d 989, 990 (7th Cir. 2000) (quoting *Powell*, 395 U.S. at 496); *Timms on Behalf of Timms v. Metro. Sch. Dist. of Wabash Cnty., Ind.*, 722 F.2d 1310, 1315 (7th Cir. 1983) (quoting *Powell*, 395 U.S. at 496).

When a dispute between the parties ceases to exist—that is, when the issues presented are either no longer "live" or a party loses his "personal stake" in the outcome of the litigation—a case becomes moot. *Nike*, 133 S. Ct. at 726-27 (quoting *Murphy*, 455 U.S. at 481). In other words, a "case is moot when no further judicial relief is possible." *In re Res. Tech. Corp.*, 430 F.3d 884, 886 (7th Cir. 2005). "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974) (citing *Roe v. Wade*, 410 U.S. 113, 125 (1973); *Medical Comm'n for Human Rights*, 404 U.S. at 409; *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950)). This "rule" is part of the constitutional "Case" or "Controversy" requirement. *Lewis*, 494 U.S. at 477-78; *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, an actual controversy must be extant *at all stages of review*, not merely at the time the complaint is filed.") (quoting *Preiser*, 422 U.S. at 401) (internal quotation marks omitted) (emphasis supplied). "It is not enough that a dispute was very much alive when suit was filed; the parties must continue to have a personal stake in the ultimate disposition of the lawsuit." *Chafin*, 133 S. Ct. at 1023 (quoting *Lewis*, 494 U.S. at 477-78) (internal quotation marks omitted).

It is well-established in this Circuit that "[o]nce the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate, and a plaintiff who refuses to acknowledge this loses outright, under Fed. R. Civ. P. 12(b)(1), because he has no remaining stake." *Rand v. Monsanto Co.*, 926 F.2d 596, 597-98 (7th Cir. 1991). "[A] defendant may effectively eliminate a controversy by offering to satisfy a plaintiff's entire demand." *Alswager v. Rocky Mountain Instrumental Labs. Inc.*, 474 F. App'x 482, 484 (7th Cir. 2012) (citing *Thorogood v. Sears, Roebuck & Co.*, 595 F.3d 750, 752-53 (7th Cir. 2010); *Gates v. Towery*, 430

17

F.3d 429, 431-32 (7th Cir. 2005); *Holstein v. City of Chi.*, 29 F.3d 1145, 1147 (7th Cir. 1994);

*Monsanto*, 926 F.2d at 598; *Alliance to End Repression v. City of Chi.*, 820 F.2d 873, 878 (7th

Cir. 1987)). When a settlement offer "makes the plaintiff whole," it is sufficient to moot her

claim. *Gates v. City of Chi.*, 623 F.3d 389, 413 (7th Cir. 2010) (hereinafter "*Gates II*") (citing

*Gates*, 430 F.3d at 431 (7th Cir. 2005) (hereinafter "*Gates I*")). To make the plaintiff whole, the

offer "must include the filing fees and other costs under 28 U.S.C. § 1920."[8] *Gates I*, 430 F.3d at

431. A plaintiff cannot preserve her interest merely by refusing a defendant's offer of complete

relief. *Holstein*, 29 F.3d at 1147; *Gates II*, 623 F.3d at 413. *See Alliance to End Repression*, 820

F.2d at 878 ("Our conclusion that [a] case is not justiciable answers a question raised [by the

Supreme Court in] *Deposit Guarantee National Bank, Jackson, Mississippi v. Roper*, 445 U.S.

326 (1980): whether a plaintiff who is offered all the relief [s]he demands may refuse the offer

and go to trial. The answer is no."). These principles flow from the maxim that: "You cannot

persist in suing after you've won." *Greisz v. Household Bank (Ill.), N.A.*, 176 F.3d 1012, 1015

(7th Cir. 1999).

In the context of putative class actions, such as the one now before the Court, the Seventh

Circuit has made it clear that when a defendant makes a complete offer of relief to the plaintiff

class representative *before* the plaintiff class representative moves for class certification, the

plaintiff class representative's individual claim is mooted. *Holstein*, 29 F.3d at 1147. As one

---

[8] 28 U.S.C. § 1920 provides for the "[t]axation of costs," and states: "A judge or clerk of any court of the United States may tax as costs the following: [f]ees of the clerk and marshal; [f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case; [f]ees and disbursements for printing and witnesses; [f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; [d]ocket fees under section 1923 of this title; [c]ompensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title. A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree." 28 U.S.C. § 1920(1)-(6).

court in this District recently observed, the rule in the Seventh Circuit is that "an offer's effect depends on its timing: offers received before a motion for class certification is filed moot the case, but offers received after the motion has been filed do not." *White v. Humana Health Plan, Inc.*, No. 06 C 5549, 2007 WL 1297130, at *6 (N.D. Ill. May 2, 2007) (Leinenweber, J.) (citing *Greisz*, 176 F.3d at 1015; *Holstein*, 29 F.3d at 1147); *see also Radha Geismann, M.D., P.C. v. Allscript Healthcare Solutions, Inc.*, 764 F. Supp. 2d 957, 959-60 (N.D. Ill. 2011) (Keys, Mag. J.) ("[I]n the class action context the impact of the offer turns on its timing. Typically, if the full-relief offer comes before the plaintiff moves for class certification, the offer eliminates the controversy, and the suit becomes moot.") (citing *White*, 2007 WL 1297130, at *6; *Holstein*, 29 F.3d at 1147) (internal citations and quotation marks omitted); *Wiskur v. Short Term Loans LLC*, 94 F. Supp. 2d 937, 939 (N.D. Ill. 2000) (Gettelman, J.) ("An offer of settlement (or judgment) greater than the named plaintiff's claim that comes before a motion for class certification is the equivalent of a default judgment against the defendant, and eliminates the legal dispute upon which federal jurisdiction can be based.") (citing *Greisz*, 176 F.3d at 1015; *Holstein*, 29 F.3d at 1147).

In *Winokur v. Bell Fed. Sav. & Loan Ass'n*, 560 F.2d 271, 277 (7th Cir. 1977), the Seventh Circuit held: "When there is no determination that an action be maintained as a class action and the controversy between the named party in his own interest and his opponent dies, court adjudication is not appropriate because there is no controversy between parties who are present or represented before the court in the action." However, the Seventh Circuit also addressed the situation where class certification is granted, holding that when the named party's personal interest becomes moot after class certification has been granted, "court adjudication of the merits remains appropriate because the interests of class members are sufficiently represented

19

by the named party so that controversy between the class members and the opponent is still alive

and being litigated in the action." *Id.*

On April 16, 2013, after the case at bar had become fully briefed, the Supreme Court

issued its decision in *Genesis Healthcare Corp. v. Symczyk*, ——U.S.——,——, 133 S. Ct. 1523

(2013). The issue in that case, as stated by the Court, was

> The Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 201 *et seq.*, provides
> that an employee may bring an action to recover damages for specified violations
> of the Act on behalf of himself and other 'similarly situated' employees. We
> granted certiorari to resolve whether such a case is justiciable when the lone
> plaintiff's individual claim becomes moot. We hold that it is not justiciable.

*Genesis Healthcare Corp.*, 133 S. Ct. at 1527. However, the Court explicitly declined to address

the issue of "whether an unaccepted offer that fully satisfies a plaintiff's claim is sufficient to

render the claim moot." *Id.* at 1528 (footnote omitted). The Supreme Court stated that "[w]hile

the Courts of Appeals disagree whether an unaccepted offer that fully satisfies a plaintiff's claim

is sufficient to render the claim moot, we do not reach this question, or resolve the split, because

the issue is not properly before us." *Id.* at 1528-29 & 1528 n.3 (footnote omitted) (illustrating

the split among the Circuits by comparing *Weiss v. Regal Collections*, 385 F.3d 337, 340 (3d Cir.

2004), with *McCauley v. Trans Union, LLC*, 402 F.3d 340, 342 (2d Cir. 2005)). Thus, the

Supreme Court has quite recently avoided the very question that is at the heart of the case at bar:

does an unaccepted offer that fully satisfies a plaintiff's claim render it moot? Nevertheless,

there is clear and binding authority from the Court of Appeals for the Seventh Circuit on this

issue, which, in the absence of guidance from the Supreme Court, this Court is compelled to

follow and apply. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004)

("Just as the court of appeals must follow decisions of the Supreme Court whether or not we

agree with them, so district judges must follow the decisions of this court whether or not they

agree.") (citing *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *United States v. Ramsey*, 785 F.2d 184 (7th Cir. 1986)) (internal citations omitted).

In *Holstein v. City of Chi.*, 803 F. Supp. 205, 207 (N.D. Ill. 1992) (Williams, J.), *aff'd*, 29 F.3d 1145 (7th Cir. 1994), the district court was presented with two named plaintiffs, Robert A. Holstein and Brian Grove, who brought claims individually and on behalf of all others similarly situated against the City of Chicago after the City towed their vehicles pursuant to Chicago Municipal Code § 9–92–030. Holstein and Grove argued that Municipal Code § 9–92–030, "which govern[ed] when cars may be towed by the City," was unconstitutional "because it afford[ed] the City the power to tow cars arbitrarily." *Id.*

Grove parked his car near Comiskey Park (now U.S. Cellular Field) on two consecutive nights to watch the Chicago White Sox play baseball. *Id.* On both nights Grove parked legally in the vicinity of the ballpark, but the City towed his car nevertheless. *Id.* He subsequently contested the validity of the tows at a post-tow hearing pursuant to Chicago Municipal Code § 9-92-080. *Id.* The presiding officer deemed the tows valid, and Grove then joined the suit individually and as a purported named plaintiff. *Id.*

Before the named plaintiffs moved for class certification in the district court, but after Grove joined the action as a named plaintiff, the City informed Grove that it had determined that both tows of his car were improper, and that it had instituted procedures to refund Grove the amounts that he had paid in towing and storage fees. *Id.* at 207-08. Grove refused the City's offer. *Id.* 208. The City argued "that because it ha[d] already determined that its towing of plaintiff Grove's vehicle was improper, and ha[d] reversed and dismissed all related determinations against him, and ha[d] attempted to refund Grove's tow fees, there [was] no

21

longer any case or controversy between Grove and the City." *Id.* However, Grove refused to

accept the City's refund, which he characterized "as an attempt by the City to 'buy off' his claim.

Grove contend[ed] that the City ha[d] not forced and may not attempt to force him out of his

position as representative plaintiff." *Id.* Grove argued that rather than accepting the City's

proffered refund he could continue to litigate the suit against the City as a named plaintiff. *Id.* at

209. The district court, in an opinion by then-District Judge Ann Claire Williams,[9] held that

"Grove's contention that he may opt to refuse to accept the City's refund of his towing fees and

continue prosecuting this action against the City [was] doomed to failure for three reasons." *Id.*

First, Judge Williams noted that Grove did not move for class certification until two weeks *after*

the City offered him a refund. *Id.* "Thus, plaintiff Grove was effectively 'made whole' by

having his tow invalidated well before attempting to become a class representative." *Id.* Second,

she noted that "Grove's untimely motion [for class certification] was denied, and no motion for

certification [was] currently pending." *Id.* Finally, Judge Williams stated:

> Grove would like to seek to be made whole, as long as such a resolution does not
> hamper his ability to press the constitutional issues at bar. While the court will
> not speculate as to what plaintiffs' grand scheme might be, Grove's refusal of the
> relief he initially sought suggests an attempt to use the judicial system in a manner
> in which it was not intended to be employed.

*Id.* Judge Williams therefore held that Grove's claims were mooted by the City's complete offer

of relief, which eliminated his personal stake in the suit. *Id.* at 209-10. Thus, she dismissed

Grove's claims with prejudice for lack of subject-matter jurisdiction because "Grove [was]

---

[9] Judge Ann Claire Williams served as a District Judge for the United States District Court for the Northern District of Illinois from 1985 through 1999. In 1999, President Clinton nominated Judge Williams to fill a vacancy on the United States Court of Appeals for the Seventh Circuit, and the Senate unanimously confirmed her nomination. In 1999, Judge Williams assumed her seat on the Court of Appeals—the Court on which she continues to serve as a Circuit Judge.

unable to demonstrate that an actual case or controversy exist[ed]," and, therefore, the action was moot. *Id.* at 209-10.

On appeal to the Seventh Circuit, the appellate court affirmed the decision of the district court, stating that "[i]n this case, the City has offered Grove all the damages due him; he does not argue that the offer does not adequately reimburse him or that the City's offer is insincere. Grove may not spurn [the City's] offer of all the damages he is owed and proceed to trial." *Holstein*, 29 F.3d at 1147 (citing *Geraghty*, 445 U.S. at 398). The Seventh Circuit quoted Judge Easterbrook's comment in *Monsanto* that "[o]nce the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate, and a plaintiff who refuses to acknowledge this loses outright, under Fed. R. Civ. P. 12(b)(1), because he has no remaining stake." *Id.* (quoting *Monsanto*, 926 F.2d at 598; citing *Alliance to End Repression*, 820 F.2d at 878) (internal citations and quotation marks omitted). The court stated that "[a] case becomes moot when the dispute between the parties no longer rages, or when one of the parties loses his personal interest in the outcome of the suit." *Id.* (citing *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081, 1085 (7th Cir. 1992)). "Hence," the Seventh Circuit held "Grove's claim is moot." *Id.*

In *Holstein* the Seventh Circuit noted the special mootness considerations that obtain when a plaintiff seeks to represent a class, noting that "[o]rdinarily, simply determining that a plaintiff's case is moot dictates that his claim must be dismissed for lack of subject matter jurisdiction. But mootness requirements are somewhat different where the plaintiff attempts to represent a class." *Id.* Thus, "[i]f the district court has certified the class before the expiration of the plaintiff's claims, mootness is avoided." *Id.* (citing *Geraghty*, 445 U.S. at 398). In *Holstein*, however, "Grove [could] not claim the benefit of this exception to the mootness doctrine because

the district court did not certify the class; indeed, *Grove did not even move for class certification prior to the evaporation of his personal stake.* Grove, then, [could not] avail himself of the class action exception to the mootness doctrine." *Id.* (emphasis supplied). Therefore, the Seventh Circuit affirmed the district court's mooting of Grove's claim. *Id.*; *see also Greisz*, 176 F.3d at 1014-15 (Affirming the district court's mooting of the plaintiff's claim where the individual plaintiff refused the defendant's Rule 68 offer of judgment for more than the claim was worth,[10] and that was made after the district court declined to certify a class because, in the words of the Seventh Circuit, "[s]uch an offer, by giving the plaintiff the equivalent of a default judgment . . . eliminate[d] a legal dispute upon which federal jurisdiction [could] be based.") (citing *Holstein*, 29 F.3d at 1147; *Monsanto*, 926 F.2d at 597-98; *Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986)); *Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 546-47 (7th Cir. 2003) ("[T]he mooting of the named plaintiff's claim in a class action by the defendant's satisfying the claim does not moot the action so long as the case has been certified as a class action or . . . so long as a motion for class certification has been made and not ruled on, unless . . . the movant has been dilatory.") (citing *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51-52 (1991); *Sosna*, 419 U.S. at 400-01; *Parks v. Pavkovic*, 753 F.2d 1397, 1403 (7th Cir. 1985); *Susman v. Lincoln Am. Corp.*, 587 F.2d

---

[10] Federal Rule of Civil Procedure 68 provides, in relevant part:

> At least 14 days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued. If, within 14 days after being served, the opposing party serves written notice accepting the offer, either party may then file the offer and notice of acceptance, plus proof of service. The clerk must then enter judgment.

Fed. R. Civ. P. 68(a). Prior to the 2009 amendments to the Federal Rules of Civil Procedure, Rule 68 allowed service of an offer of judgment more than 10 days before the trial was to begin and provided the opposing party 10 days to accept the offer. Fed. R. Civ. P. 68 (1937) (amended 2009).

866, 870 (7th Cir. 1978); *Hillenbrand v. Meyer Medical Grp., S.C.*, 720 N.E.2d 287, 296 (Ill.
App. Ct. 1st Dist. 1999)).

The Seventh Circuit faced this issue again in *Gates II*, 623 F.3d at 413. After the Seventh
Circuit affirmed the class certification and mootness determinations this Court made in *Gates v.
Towery*, No. 04 C 2155, 2004 WL 2583905, at *3, *9 (N.D. Ill. Nov. 10, 2004) (hereinafter
"*Gates I*") (Castillo, J.), *aff'd*, 430 F.3d 429 (7th Cir. 2005), the plaintiffs were granted leave to
file a fifth amended complaint on their State-law "restitution claims," under which they sought
the return of their money that had been seized by the police. *Gates II*, 623 F.3d at 394.

This Court dismissed the restitution claims and denied a request to certify a restitution
class because the Court found that those claims were moot. *Gates v. Towery*, 456 F. Supp. 2d
953, 961 (N.D. Ill. 2006) (hereinafter "*Gates II*") (Castillo, J.), *aff'd sub nom. Gates v. City of
Chi.*, 623 F.3d 389 (7th Cir. 2010). In *Gates II*, this Court held

> As the City has tendered full payment to the named plaintiffs, the named
> plaintiffs' restitution-based claims are moot. . . . Plaintiffs' motion to certify the
> class . . . did not preserve the restitution-based claims because the restitution-
> based claims did not even surface until the Fifth Amended Complaint [which was
> filed two years after the motion for class certification]. Thus, both [of the named
> plaintiffs'] restitution-based claims were mooted by the City's tender of full
> restitution years before they raised their restitution-based claims. . . Thus, the
> restitution-based [class] claims, like the claims of the named plaintiffs, are moot. .
> . . [and] are dismissed as moot."

*Id.* The Seventh Circuit briefly addressed the mootness of potential restitution claims in *Gates I*.
430 F.3d at 432. There, "[t]he appellate court stated that [the plaintiffs] lacked standing to seek
injunctive relief for past losses 'beyond the equitable remedy of restitution—and the City st[ood]
ready to hand over the amounts it seized, in order to avoid unjust enrichment.' Thus, the Seventh
Circuit [ ] indicated that to the extent Plaintiffs decided to seek restitution, those claims [were]

barred by the City's willingness to return the money seized." *Gates II*, 456 F. Supp. 2d at 961 (quoting *Gates I*, 430 F.3d at 432).

On appeal, the Seventh Circuit, relying on the authority of *Holstein*, found that "the City tendered the full amounts the plaintiffs requested in the restitution counts long before the plaintiffs even added these claims to their complaints. That tender ended any dispute over restitution, and the plaintiffs cannot revive it by simply refusing the tender." *Id.* at 413 (citing *Holstein*, 29 F.3d at 1147). The Seventh Circuit held that the fact that "plaintiffs sought to certify a restitution class does not change this result because they did not add the claims or move to certify the class until *after* their personal stake in the action had evaporated." *Id.* (citing *Holstein*, 29 F.3d at 1147) (emphasis supplied). Finally, in affirming this Court's ruling in *Gates II*, 456 F. Supp. 2d at 961, the Seventh Circuit reasoned that because the facts of the case did "not lend themselves to any exception to the general rule," the plaintiffs' restitution claims were moot and subject to dismissal for lack of subject-matter jurisdiction. *Gates II*, 623 F.3d at 413.

The Seventh Circuit applied *Holstein* and its progeny again in *Damasco*, reaffirming that a plaintiff cannot avoid mootness when he does not move for class certification *before* his personal stake in the litigation expires. 662 F.3d at 895 (citing *Holstein*, 29 F.3d at 1147; *Greisz*, 176 F.3d at 1015; *Gates II*, 623 F.3d at 413). In *Damasco*, as in the case at bar, the named plaintiff, Jerome Damasco, brought a putative class action against the defendant, Clearwire Corporation ("Clearwire"), for alleged violations of the TCPA. *Id.* at 893. And like the case at bar, before Damasco moved for class certification, Clearwire offered him $1,500 for each message that he received, plus fees and costs. *Id.* Clearwire, again as in the case at bar, also offered injunctive relief by agreeing to refrain from sending unsolicited text messages to "mobile

26

subscribers." *Id.* As here, after Damasco refused the offer, Clearwire moved to dismiss the case as moot. *Id.*

Damasco initially filed his claim in State court. *Id.* Within a month, Clearwire sent its offer letter to Damasco's attorney. *Id.* Four days after sending the letter, Clearwire removed the case to federal court. *Id.* Damasco moved for class certification within hours of the removal. *Id.* The following day, Clearwire "moved to dismiss the case, arguing that its settlement offer stripped Damasco of his personal stake in the case's outcome and rendered his claim moot." *Id.* In the district court, Damasco argued, *inter alia*, that if Clearwire had made its offer under Rule 68 of the Federal Rules of Civil Procedure then he would have had a ten-day window in which to certify the class and avoid mootness. *Damasco*, 2010 WL 3522950, at *4 (footnote omitted). However, after carefully reviewing the caselaw, the district court found that applying the ten-day window is "arbitrary" when a defendant makes a settlement offer not pursuant to Rule 68. *Id.* at *9.

Judge Zagel stated in *Damasco*: "The rule in the Seventh Circuit is clear—a complete offer of settlement made prior to the filing for class certification moots the plaintiff's claim." *Id.* at *4. There, as here, Damasco argued that Clearwire's offer was indeterminate as to the number of messages, and that, therefore, his case remained "live." *Id.* at *2. The district court rejected that argument, stating that "[t]hough no particular number of messages is listed, the [settlement] Letter states that Clearwire would pay for 'each and every message'—meaning all messages received by Plaintiff. This is not an indefinite term." *Id.* at *3. Damasco had to "take steps" before Clearwire's offer could take effect, but the court rejected that argument as a reason to hold that Clearwire's offer was not one of full relief. *Id.* Judge Zagel went on to note that "[i]t is also difficult to see why Clearwire's failure to 'identify' the text messages invalidates the offer,

where Clearwire has agreed to compensate Plaintiff for each and every unauthorized message from Defendant." *Id.* Therefore, the district court, "bound by" the authority of *Holstein*, dismissed the case as moot because Clearwire made its settlement offer before Damasco filed for class certification, which eliminated his personal stake in the matter. *Id.* at *9 (citing *Holstein*, 29 F.3d at 1147).

On appeal, the Seventh Circuit affirmed the district court's ruling and stated "that the complaint identifies the suit as a class action is not enough by itself to keep the case in federal court. Even when a complaint clearly and in great detail describes the suit as a class action suit, if the plaintiff does not seek class certification, then dismissal of the plaintiff's claim terminates the suit." *Damasco*, 662 F.3d at 896 (quoting *Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 424 (7th Cir. 2011)) (internal quotation marks omitted). The court ratified that statement, made in the court below, that "[t]he rule in the Seventh Circuit is clear—a complete offer of settlement made prior to the filing for class certification moots the plaintiff's claim." *Id.* at 894. Relying on its prior caselaw, the Seventh Circuit noted that in *Holstein* "[b]efore [the named plaintiff] moved to certify, the city offered him full reimbursement. We refused to let him 'spurn this offer' and avoid mootness when he 'did not even move for class certification prior to the evaporation of his personal stake.' The plaintiff's lack of a personal stake, we held, stripped us of jurisdiction over his claim." *Id.* at 895 (quoting *Holstein*, 29 F.3d at 1147) (internal citations omitted). The *Damasco* court went on to note that "[it] repeated this holding in *Greisz*, remarking that an offer to a named plaintiff does not moot a class action *unless* it 'comes before class certification is sought.' We later confirmed that a plaintiff cannot avoid mootness by moving for class certification after receiving an offer of full relief." *Id.* (quoting *Greisz*, 176 F.3d at 1015; citing *Gates II*, 623 F.3d at 413). The court thus held that "[a]fter Clearwire made its offer, Damasco's

federal case was over." *Id.* at 896 (citing *Greisz*, 176 F.3d at 1015). The court noted that "the case would be over even if it had remained in state court; the Illinois Supreme Court recently reaffirmed that its approach is the same as ours." *Id.* (citing *Barber v. Am. Airlines, Inc.*, 948 N.E.2d 1042, 1045-47 (Ill. 2011)). The Seventh Circuit specifically noted that there is a "simple solution to the buy-off problem that Damasco identifies . . . available, and it does not require us to forge a new rule that runs afoul of Article III: Class-action plaintiffs can move to certify the class at the same time that they file their complaint. The pendency of that motion protects a putative class from attempts to buy off the named plaintiffs." *Id.* at 869 (citing *Primax*, 324 F.3d at 546–47).

In *Geraghty*, 445 U.S. at 400, the Supreme Court had remarked upon "the flexible character" of the Article III mootness doctrine. The form of the jurisdictional inquiry is a flexible one: "As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court." *Gibbs*, 307 U.S. at 71-72. Thus, Damasco, purportedly relying on the authority of *Geraghty*, asked the Seventh Circuit "to create an exception to mootness in potential class actions where defendants offer relief to named plaintiffs before they have a reasonable opportunity to seek certification. He point[ed] out that mootness is a 'flexible' doctrine, and argue[d] that *Holstein*, which conflict[ed] with his proposed exception, should be restricted to its facts or overturned. . . . or distinguished so as not to control the outcome in this case." *Damasco*, 662 F.3d at 895 (quoting *Geraghty*, 445 U.S. at 400). The Seventh Circuit flatly rejected this argument, reaffirmed *Holstein*, and declined the invitation to overrule or confine it. *Id.*

The case at bar is almost perfectly on all fours with *Damasco*, as well as with *Holstein* and its progeny, which control the outcome here. The Court must now decide whether

Westlake's offer was an offer of *complete* relief such that Scott does not retain any personal stake in her claims, thereby mooting them and requiring dismissal for lack of subject-matter jurisdiction. (R. 19, Def.'s Mem. at 4-5; R. 23, Pl.'s Resp. at 4; R. 25, Def.'s Reply at 1.)

Scott claims that Westlake used an ATDS to call her cellular telephone without her prior express consent in violation of Section 227(b)(1)(A) of the TCPA, and she specifically alleges that 20 such telephone calls were made between November 12 and November 16, 2012. (R. 6, Am. Compl. ¶¶ 12-19.) Westlake contends that its February 5, 2013 e-mail, which was transmitted to Scott before she moved for class certification, was an unconditional offer to pay Scott $1,500 for "each and every" automated call made to Scott's cellular telephone in violation of the Act during the alleged time period, the maximum statutory penalty, and therefore that its offer was one of full relief which stripped Scott of her personal stake in this matter, rendering her claims moot and subject to mandatory dismissal pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject-matter jurisdiction. (R. 19, Def.'s Mem. at 4-5; R. 19-1, Def.'s Mem., Ex. A, Settlement E-mail.)

Scott argues that her case remains "live," as Westlake's offer was incomplete because it only offered relief for six of the 20 automated calls alleged in the complaint. (R. 23, Pl.'s Mem. at 4.) In support of this, Scott relies on *Gates I*, in which the Seventh Circuit held that in order "[t]o eliminate the controversy and make a suit moot, the defendant must satisfy the plaintiffs' *demands*; only then does no dispute remain between the parties." 430 F.3d at 432 (emphasis in original). The facts of *Gates I* are inapposite to the case at bar, and Scott's argument relying on it fails.

In *Gates I*, "the City of Chicago offered to return Plaintiffs' money before Plaintiffs filed their class certification motion." 2004 WL 2583905, at *2. The defendants argued that

30

"Plaintiffs lack[ed] standing to represent the proposed class because the case was mooted when"

the City made its offer to return the plaintiffs' money. *Id.* The plaintiffs refused to accept the

checks because the City did not include "numerous forms of relief" that they sought in their

demand. *Id.* at *3. This Court noted that the "claims of a plaintiff seeking injunctive relief from

a purportedly unconstitutional government policy may become moot where the government

voluntarily implements a new policy eradicating any reasonable expectation that the purportedly

unconstitutional conduct will be repeated." *Id.* at *2 (citing *Jones v. Bowman*, 120 F.R.D. 88, 91

(N.D. Ill. 1988)). Furthermore, this Court stated that "[i]f a plaintiff receives all of the monetary

and injunctive relief sought, a request for a declaratory judgment and attorney's fees alone will

not provide a justiciable controversy." *Id.* (citing *Alliance to End Repression*, 820 F.2d at 875-

76, 878). In *Gates I*, although "Defendants . . . brought forth evidence showing that they offered

Plaintiffs the monetary relief they [sought]," this was insufficient because "they [did] not assert .

. . that they offered to discontinue the alleged practice that Plaintiffs challenge[d]." *Id.* at *3.

The Court reiterated that "[i]f Defendants had offered not to engage in the purportedly

discriminatory policy along with its offer to return Plaintiffs' money with interest, that may have

mooted Plaintiffs' claims." *Id.* (citing *Alliance to End Repression*, 820 F.2d at 877).

On appeal, the Seventh Circuit affirmed the decision of this Court and found that the City

was "unwilling to satisfy plaintiffs' demands" and had only tendered what it *believed* it owed.

*Gates I*, 430 F.3d at 432. Judge Easterbrook, writing for the court, stated that the plaintiffs were

"entitled to a judge's decision on what if any relief (in addition to return of the seized funds) is

appropriate. . . . A defendant cannot simply assume that its legal position is sound and have the

case dismissed because it has tendered everything it *admits* is due. Mootness occurs when no

more relief is possible. That point has not been reached." *Id.* The Seventh Circuit found that the

31

City's offer to the plaintiffs was inadequate—and thus incomplete—because it did not include compensation for prejudgment interest, nominal damages, compensatory damages, costs, and attorneys' fees; therefore, the plaintiffs' claims remained "live" and were not mooted. *Id.* at 431-32. Scott's reliance on *Gates I* is misplaced. The case that is more analogous to the case at bar is *Gates II, supra.*

In *Gates I*, the City's offer was merely for what it admitted it owed in accordance with its own legal analysis. 430 F.3d at 432. That is not the case here. Westlake's offer to Scott gives her everything that she could possibly recover in her suit. (R. 19-1, Def.'s Mem., Ex. A, Settlement E-mail.) In contrast to the offer in *Gates I*, Westlake's offer to Scott satisfies her *entire* demand; therefore, Westlake made an offer of complete relief. *See Monsanto*, 926 F.2d at 598. Westlake offered to pay Scott "the sum of $1,500 for *each and every* dialer-generated telephone call" that it made in violation of Section 227(b)(1)(A) of the TCPA, the maximum statutory penalty. (R. 19-1, Def.'s Mem., Ex. A, Settlement E-mail) (emphasis supplied). While Westlake identified "a total of only six dialer-generated calls" as of its February 5, 2013 settlement e-mail, the language of the offer clearly manifests an intention on the part of Westlake to satisfy Scott's claims for the total number of calls that Westlake made to her in violation of the TCPA. (*Id.*) As the Seventh Circuit stated in *Gates II*, 623 F.3d at 394, "[t]o eliminate the controversy and render the case moot . . . a defendant must meet the plaintiff's demands;" Westlake has done exactly that here. That a determination remains to be made as to the exact number of calls does not render Westlake's offer incomplete.

Like Clearwire in *Damasco*, Westlake did not offer Scott a specific amount of relief, but rather offered to pay for "each and every" violating phone call that is discovered to have occurred—which this Court holds to mean all telephone calls that Westlake made to Scott in

32

violation of the Act. *See Damasco*, 2010 WL 3522950, at *3; (R. 19-1, Def.'s Mem., Ex. A,

Settlement E-mail) ("Westlake offers to pay plaintiff the sum of $1,500 for each and every

dialer-generated telephone call made to plaintiff."). Westlake additionally offered to pay Scott

"all costs which she would recover if she were to prevail in the lawsuit, including the cost of any

filing fee and any service fees which would be taxable as costs," thus satisfying *Gates I*, 430

F.3d at 431. (R. 19-1, Def.'s Mem., Ex. A, Settlement E-mail.) Westlake further agreed to the

injunction that Scott demanded in her prayer for relief, prohibiting Westlake from making calls

to Scott's cellular telephone without her prior express consent. (*Id.*) ("Westlake will also agree

to the entry of an injunction prohibiting Westlake from making any calls to plaintiff's cellular

telephone without her prior express consent."). Scott cannot "demonstrate a personal stake in the

outcome [of this case] in order to assure that concrete adverseness which sharpens the

presentation of issues necessary for the proper resolution of" a controversy. *City of L.A. v.

Lyons*, 461 U.S. 95, 101 (1983).

Westlake agreed to Scott's demand for injunctive relief, offered to pay her all of the costs

and fees that she could recover were she to prevail at trial, and offered her the full relief possible

for "each and every" call which Westlake made in violation of the TCPA and for which Scott

could recover statutory damages pursuant to Sections 227(b)(3)(B) & (C) of the Act. (R. 19-1,

Def.'s Mem., Ex. A, Settlement E-mail.) Thus, Westlake's offer provides Scott with everything

she prays for in her complaint. (R. 6, Am. Compl. ¶ 7.) Westlake's offer effectively makes

Scott whole, and she may not "spurn" the offer and continue to litigate this action when her

claims have been fully satisfied. *See Holstein*, 29 F.3d at 1147; *Gates II*, 623 F.3d at 413;

*Damasco*, 662 F.3d at 895. As noted earlier, Judge Easterbrook stated in *Monsanto* that "[o]nce

the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to

litigate, and a plaintiff who refuses to acknowledge this loses outright, under Fed. R. Civ. P.

12(b)(1), because [s]he has no remaining stake." *Monsanto*, 926 F.2d at 598 (citing *Alliance to

End Repression*, 820 F.2d at 878) (internal citations omitted). The Court therefore finds that

Westlake's offer satisfied Scott's entire demand, and was thus an offer of full relief, and rejects

Scott's contention that Westlake's offer was incomplete because it listed only six dialer-

generated calls. *See Damasco*, 2010 WL 3522950, at *3.

There is no longer a "live" dispute in this case over which the Court can rule. *See id.*

Because Westlake made a complete offer of relief to Scott *before* she moved for class

certification, the Court finds that Scott's personal interest in both of her claims under the TCPA

was eliminated, and that she lacks "a legally cognizable interest in the outcome" of the case,

thereby mooting her claims and divesting this Court of subject-matter jurisdiction over them.

*See Powell*, 395 U.S. at 496; *Holstein*, 29 F.3d at 1147; *Greisz*, 176 F.3d at 1041; *Primax

Recoveries*, 324 F.3d at 546-47; *Gates II*, 623 F.3d at 413; *Damasco*, 662 F.3d at 896.

Furthermore, Scott's claims do "not lend themselves to any exception to the general rule" that a

plaintiff's claims are mooted by a defendant's offer of full relief before a motion for class

certification is filed. *See Gates II*, 623 F.3d at 413. As in *Holstein*, this Court is unaware of the

strategy that Scott is attempting to employ by rejecting Westlake's offer of complete relief, but in

the words of Judge Williams, her "refusal of the relief [s]he initially sought suggests an attempt

to use the judicial system in a manner in which it was not intended to be employed." 803 F.

Supp. at 209. This Court will not tolerate any pursuit by Scott to manipulate the judicial system

by continuing to litigate her cause of action after it has become moot. Because Westlake's offer

to Scott is one of complete relief, she is essentially victorious in her suit, and, as Judge Posner

would admonish her: "You cannot persist in suing after you've won." *Greisz*, 176 F.3d at 1015.

34

Because the Court finds that Scott's claims are moot, it lacks subject-matter jurisdiction over them, and accordingly they must be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

This leaves open the question of how the terms and conditions of Westlake's February 5, 2013 settlement offer to Scott shall be enforced given the Court's conclusion that it lacks subject-matter jurisdiction over this cause of action. (R. 19-1, Def.'s Mem., Ex. A, Settlement E-mail.) If either Westlake or Scott refuses to comply with their respective obligations as set forth in the offer, some recourse must be available to the aggrieved party. (*Id.*) But if this Court has no subject-matter jurisdiction to adjudicate Scott's claims, by what authority (if any) does the Court possess jurisdiction to enforce the terms and conditions of the offer?

In *Kokkonen*, the Supreme Court unanimously answered this question. 511 U.S. at 378. The Court held that "[e]nforcement of [a] settlement agreement . . . is more than just a continuation or renewal of the dismissed suit, and hence requires its own basis for jurisdiction." *Id.* However, Justice Scalia, writing for the Court, noted that where a district court makes "the terms of the settlement agreement . . . part of the order of dismissal—either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order," then "a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist." *Id.* at 381. (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991); *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469, n.1 (1974); *Moore v. N.Y. Cotton Exchange*, 270 U.S. 593, 610 (1926); *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812)).

Seventh Circuit caselaw is fully in accord with *Kokkonen*. *See, e.g., Hill v. Baxter Healthcare Corp.*, 405 F.3d 572, 576 (7th Cir. 2005) ("Thus if the judgment explicitly

incorporates the settlement, or reserves authority to enforce the settlement, the court possesses ancillary jurisdiction," to enforce an agreement between parties when the predicate claims have been dismissed.) (citing *Kokkonen*, 511 U.S. at 382) (internal citations quotation marks omitted); *Int'l Armor & Limousine Co. v. Moloney Coachbuilders, Inc.*, 272 F.3d 912, 917 (7th Cir. 2001) ("[A] settlement of a suit arising under federal law normally is a contract that can be enforced in federal court only if there is an independent source of jurisdiction, such as diversity of citizenship. . . . [However,] if a court retains jurisdiction to enforce the terms of a settlement, then ancillary jurisdiction may be available.") (citing *Kokkonen*, 511 U.S. at 380-81). As the Eighth Circuit has explained, "[a]ncillary jurisdiction to enforce the agreement exists in these situations because breach of the agreement violates the district court's judgment. Absent action making the settlement agreement part of a dismissal order, enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction." *Miener By & Through Miener v. Mo. Dep't of Mental Health*, 62 F.3d 1126, 1127 (8th Cir. 1995) (quoting *Kokkonen*, 511 U.S. at 380-81) (internal alterations, citations, and quotation marks omitted).

Therefore, the court retains jurisdiction to enforce compliance with the terms of Westlake's February 5, 2013 settlement offer and incorporates the terms of that offer herein.

## CONCLUSION

For the reasons set forth above, Westlake's motion to dismiss Scott's complaint (R. 18) is GRANTED. Scott's belated motion for class certification (R. 14) is DENIED. The parties are directed to conduct limited discovery as is necessary to confirm the exact number of dialer-generated calls that Westlake made to Scott in violation of Section 227(b)(1)(A) of the Telephone Consumer Protection Act. Thereafter, Westlake is directed to pay Scott the sum of

36

$1,500 for each and every dialer-generated call identified pursuant to Section 227(b)(3)(C) of the Telephone Consumer Protection Act, plus taxable costs per the terms of Westlake's February 5, 2013 settlement offer. Once payment is tendered, Scott is ordered to execute a full release of all claims against Westlake. Finally, the Court will enter an injunction upon Westlake tendering the final amount due to Scott prohibiting it from placing any additional calls to Scott's cellular telephone without first obtaining her prior express consent pursuant to Section 227(b)(3)(A) of the Telephone Consumer Protection Act. The Clerk of the Court is ordered to enter an injunction prohibiting Westlake Services, LLC from making any future calls to Etta Scott without her prior express consent once Etta Scott fully releases all claims against Westlake Services, LLC. The Clerk of the Court is further ordered to dismiss this suit with prejudice and enter final judgment in favor of Westlake Services, LLC, doing business as Westlake Financial Services, and against Etta Scott upon Westlake Services, LLC's tender to Etta Scott for every call Westlake made to her in violation of the Telephone Consumer Protection Act pursuant to the terms of Westlake Services, LLC's February 5, 2013 settlement offer. The Court retains jurisdiction to enforce compliance with Westlake's February 5, 2013 settlement offer, the terms of which are set forth in this Order.

ENTERED: _____

Judge Ruben Castillo
United States district court

Dated: June 6, 2013